No. 22-13444

# In the United States Court of Appeals for the Eleventh Circuit

CHRISTOPHER BAUGHCUM,
JR., ET AL.,

*Plaintiffs–Appellants*,

v.

GENOLA JACKSON, ET AL.,

*Defendants–Appellees.*

**BRIEF OF PLAINTIFFS-APPELLANTS**

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
NO. 3:21-CV00036-DHB-BKE

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

*Christopher Baughcum, Jr., et al. v. Genola Jackson, et al.*,
No. 22-1344

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE REPORT

I certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Association County Commissioners of Georgia-Interlocal Risk Management Agency (ACCG-IRMA), *insurer for Defendant-Appellees Jackson, Spires, and Martin*

2. Baughcum, Christopher Jr., *Plaintiff-Appellant*

3. Bergstrom, William V., *Counsel for Plaintiffs-Appellants*

4. Bowen, Judge Dudley H., *District Court Judge*

5. Burton, Beth, Deputy Attorney General, *Counsel for Defendant-Appellee Wright*

6. Carr, Christopher M., Attorney General, *Counsel for Defendant-Appellee Wright*

7. Cooper & Kirk, PLLC, *Counsel for Plaintiffs-Appellants*

8. County Reinsurance, LTD, *reinsurer for ACCG-IRMA*

9. Epps, Magistrate Judge Brian K., *Magistrate Judge*

10. Firearms Policy Coalition, Inc., *Plaintiff-Appellant*

11. Gore, Deborah Nolan, *Counsel for Defendant-Appellee Wright*

12. Jackson, Genola, *Defendant-Appellee*

13. John Monroe Law, P.C, *Counsel for Plaintiffs-Appellants below*

*Christopher Baughcum, Jr., et al. v. Genola Jackson, et al.*,
No. 22-1344

14. Long, Sophie, *Plaintiff-Appellant*

15. Martin, Kathryn B., *Defendant-Appellee*

16. Meyers, Zane, *Plaintiff-Appellant*

17. Monroe, John R., *Counsel for Plaintiffs-Appellants below*

18. Patterson, Peter A., *Counsel for Plaintiffs-Appellants*

19. Piper, Tina, Senior Assistant Attorney General, *Counsel for Defendant-Appellee Wright*

20. Spires, Janice D., *Defendant-Appellee*

21. Thompson, David H., *Counsel for Plaintiffs-Appellants*

22. Waymire, Jason C., *Counsel for Defendants-Appellees Jackson, Spires, and Martin*

23. Williams, Terry, *Counsel for Defendants-Appellees Jackson, Spires, and Martin*

24. Williams, Morris & Waymire, LLC, *Counsel for Defendants-Appellees Jackson, Spires, and Martin*

25. Wright, Chris, *Defendant-Appellee*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

C-2 of 3

*Christopher Baughcum, Jr., et al. v. Genola Jackson, et al.*,
No. 22-1344

Dated: November 21, 2022                     Respectfully submitted,

                                             /s/ David H. Thompson
                                             David H. Thompson

                                             *Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal poses several important questions, including whether 18-to-20-year-old adults have Second Amendment rights and so must be permitted some lawful avenue by which to carry handguns in public and whether Plaintiffs, who fall into that category, nevertheless lack standing to challenge a Georgia law that prevents them from exercising that right because they have not undertaken the futile step of applying for a carry license. Appellants believe oral argument would assist the Court in deciding the consequential issues presented by this appeal.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................iv

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................4

STATEMENT OF THE CASE ............................................................4

STANDARD OF REVIEW .................................................................9

SUMMARY OF THE ARGUMENT .....................................................9

ARGUMENT ...................................................................................11

   I.   Plaintiffs Have Standing to Sue All Defendants and Their Claims
      Are Live. .................................................................................11

      A. The District Court Erred in Dismissing Plaintiffs' Claims Against
         the Commissioner. ...............................................................12

      B. The District Court Erred in Holding Plaintiffs Lack Standing to Sue
         the Probate Judges..............................................................16

      C. Plaintiffs' Claims Are Not Moot............................................19

   II.  This Court Can and Should Review the Merits of Plaintiffs' Claims...........21

   III.  Plaintiffs Are Entitled to Judgment in Their Favor.......................................26

      A. The Second Amendment's Plain Text Covers Plaintiffs' Rights
         to Carry Firearms in Public for Self-Defense. .........................27

      B. The Carry Ban Cannot Be Justified by Reference to
         Historical Analogues..............................................................35

1. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights On Equal Footing With Other Adults..................................................38

2. The Overwhelming Practice From the Period Surrounding Ratification of the Fourteenth Amendment Likewise Supports Plaintiffs..........................................................................................40

CONCLUSION .....................................................................................46

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997)..................................................37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................27

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015)............28

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979) .......................................17

*Carney v. Adams*, 141 S. Ct. 493 (2020).................................................18

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ................13

*Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355
    (11th Cir. 1984).........................................................21, 22, 24, 25

*District of Columbia v. Heller*, 554 U.S. 570
    (2008) ...................................1, 3, 26, 28, 30, 31, 33, 34, 35, 36, 37

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .................................................31

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
    11 F.4th 200 (3d Cir. 2021).......................................................17, 18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)............................5

*Fla. State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008)....................................................19

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
    344 F.3d 1263 (11th Cir. 2003)....................................................13

*Ga. Latino All. for Human Rights v. Gov. of Ga.*,
    691 F.3d 1250 (11th Cir. 2012)....................................................19

*Henderson v. Scientific-Atlanta, Inc.*, 971 F.2d 1567 (11th Cir. 1992) .................22

*Henne v. Wright*, 904 F.2d 1208 (8th Cir. 1990)...............................14, 15

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ..............29, 30, 34, 39, 40, 41, 42

*Hirschfeld v. BATFE*, 14 F.4th 322 (4th Cir. 2021) ....................24, 25, 29

*In re Worldwide Web Sys., Inc.*,
    328 F.3d 1291 (11th Cir. 2003)....................................................24

*Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324 (1977) ........................17, 18

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)...............11, 15, 16

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) ...............30, 31, 32, 38, 39, 41, 42, 43

*Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022) ........................................................30

*Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020).................20

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ................................................................37

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................24, 26, 36, 40, 41, 42

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*,
 501 F.3d 1244 (11th Cir. 2007)........................................................................9

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................23

*Myers v. United States*, 272 U.S. 52 (1926).....................................................36, 37

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
 714 F.3d 334 (5th Cir. 2013)....................................................34, 40, 45, 46

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985)............................................................29

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*,
 354 F. Supp. 3d 143 (N.D.N.Y. 2018) ..........................................................23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111
 (2022) .................1, 2, 3, 23, 24, 26, 27, 28, 35, 36, 37, 38, 41, 42, 44, 45, 46

*Nunn v. Georgia*, 1 Ga. 243 (1846)........................................................................28

*Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997) ............................21, 25, 26

*Parker v. District of Columbia*, 311 F. Supp. 2d 103 (D.D.C. 2004) ....................23

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...........................31

*Perpich v. Dep't of Def.*, 496 U.S. 334 (1990)........................................................31

*Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health
 & Human Servs.*, 946 F.3d 1100 (9th Cir. 2020) ..........................................18

*Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941 (1982)................................18

*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*,
 524 F.3d 1229 (11th Cir. 2008).......................................................................9

*Strickland v. Alexander*, 772 F.3d 876 (11th Cir. 2014) ..................................11, 13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................17

*Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989).........................................................17

*Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) ........................ 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
 393 U.S. 503 (1969)........................................................................................29

*United States v. Miller*, 307 U.S. 174 (1939) ..........................................................38

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...................................29

## Constitutional and Statutory Provisions

U.S. CONST.
    amend. II ...........................................................................................2, 26
    amend. XXVI ...........................................................................................29
    art. I, § 2, cl. 2 .........................................................................................29
    art. I, § 8, cl. 16 .......................................................................................30

Act of May 8, 1792, 1 Stat. 271 (1792) ...................................................3, 30, 33, 34

O.C.G.A. § 16-11-126(h)(1) (2017)...........................................................................20

O.C.G.A.
    § 16-11-125.1(2.1) ...........................................................................4, 5, 21
    § 16-11-126(d)(1)(A) ................................................................................5
    § 16-11-126(g)(1) ...........................................................................4, 20, 21
    § 16-11-126(h) ...........................................................................................5
    § 16-11-129(a)(1)..................................................................................6, 11
    § 16-11-129(a)(2)(C)(iii).....................................................................6, 13
    § 16-11-129(a)(2)(B)(iii).........................................................................12
    § 16-11-129(b) ...........................................................................................6
    § 16-11-129(b)(2) .....................................................................................13
    § 16-11-129(b)(2)(A)........................................................................5, 11, 12
    § 16-11-129(d)(1)(A) ................................................................................6
    § 16-11-129(d)(4) ......................................................................................6
    § 17-10-3...................................................................................................5
    § 35-2-32.................................................................................................16

1856 ALA. ACTS 17 .....................................................................................................41

1856 TENN. PUB. ACTS 92 ..........................................................................................41

1883 Kan. Sess. Laws 159 ..........................................................................................43

1883 Wis. Sess. Laws 290 ..........................................................................................43

N.Y. PENAL CODE ch. 375 § 1 (1885)........................................................................43

## Legislative Materials

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834)....................................31, 32

**Other Authorities**

1 BLACKSTONE COMMENTARIES *441 (1803) ............................................................45

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES
    § 1890 (1833)................................................................................................28

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) ................................45

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE
    UNITED STATES OF AMERICA 267 (1880)..........................................29, 34, 35

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second
    Amendment*, 82 MICH. L. REV. 204 (1983)............................................32, 33

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young
    Adults*, 43 S. ILL. U. L.J. 495 (2019).......................................................33, 39

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE
    WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938)....32

Mark W. Smith, *"Not all History is Created Equal": In the post-*Bruen *World, the
    Critical Period for Historical Analogues is When the Second Amendment
    was Ratified in 1791, and Not 1868*, SSRN (Oct. 1, 2022), *available at*
    https://bit.ly/3Dm2HEI ...........................................................................35, 36

# INTRODUCTION

"[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). This right presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581 (2008). On their eighteenth birthday, the Plaintiffs in this case became legal adults for almost all purposes and certainly for the purpose of exercising their other constitutional rights. They can vote, enter contracts, and get married. They can join the military to fight and die for their country. And as adults, there are no parents or other legal guardians generally responsible for their care and protection. Yet the Georgia laws challenged in this case categorically bar them from carrying a handgun in public for self-defense as other adult Americans have the undisputed right to do.

The District Court never reached the important constitutional questions posed by this case. Instead, it dismissed Plaintiffs' claims for lack of standing, holding that the Commissioner of the Department of Public Safety—the official with responsibility for creating the forms used to make an application for a carry license— was not sufficiently connected to the statute and to Plaintiffs' injury to be a proper defendant. The District Court also found Plaintiffs lacked standing against the Probate Judges who actually approve or deny applications because Plaintiffs had not

undertaken the futile step of applying for a license that the Probate Judges could not legally grant them. Both decisions were error. Plaintiffs have sued the officials in Georgia who have a role in enforcing the unconstitutional statutes and it is well established that Plaintiffs do not need to undertake a futile act to perfect their standing. The District Court's alternate holding, made without the benefit of any briefing on the issue from the parties, that Plaintiffs' claims are moot in light of amendments to the challenged Georgia law that leave its fundamental prohibition on firearm carriage by 18-to-20-year-olds in place, is likewise baseless.

These are extremely important issues, and their resolution is urgent. The three Individual Plaintiffs in this case are still under 21 years of age, but if this case is remanded to the District Court, it is likely that they would be too old to benefit from any eventual ruling in their favor. Given that the Second Amendment right is fundamental, that is unacceptable.

Instead, this Court should reach the merits of this case and hold that Plaintiffs' Second and Fourteenth Amendment rights are violated by Georgia's unconstitutional and exclusionary law. Those rights "demand[] our unqualified deference." *Bruen*, 142 S. Ct. at 2131. The text of the Amendment leaves no doubt that it extends to typical, law-abiding 18-to-20-year-olds. On its face, the right to keep and bear arms belongs to "the people," U.S. CONST. amend. II, not the subset of the people who have attained the age of 21. And the reference to the "militia"

2

makes clear the right fully vests by age 18. Just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, which generally required all able-bodied men to enroll in the militia and to arm themselves upon turning 18. Act of May 8, 1792, 1 Stat. 271 (1792). The Act reflected the widespread understanding of the Founding era that 18-year-old citizens were well suited for militia membership—an understanding that simply cannot be squared with the notion that these Plaintiffs, ordinary 18-to-20-year-olds, fall outside the Second Amendment's protective scope. After all, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms" was the very "reason that [the] right [to keep and bear arms] was codified in a written Constitution." *Heller*, 554 U.S. at 599.

Following *Bruen*, if a law restricts conduct falling within the scope of the Second Amendment's text, it is presumptively invalid and can only be saved if Defendants demonstrate the existence of "a distinctly similar historical regulation" that burdened the right to bear arms in the same way and for the same reasons. 142 S. Ct. at 2131, 2133. But at the time the Second Amendment was ratified, there were *no laws in any state* that purported to limit the rights of 18-to-20-year-olds to carry firearms for self-defense and there were several that *required* 18-year-olds to own and maintain firearms. Defendants will not be able to point to any historical tradition that could justify Georgia's attempt to deviate from the plain text of the Second

3

Amendment, therefore this Court should direct judgment be entered in Plaintiffs' favor.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The District Court entered final judgment dismissing Plaintiffs' claims on October 6, 2022. App. 71. Plaintiffs timely filed their notice of appeal on October 11, 2022. App. 75. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether Appellants have standing to sue the officials Georgia has charged with carrying out its firearms carriage licensing scheme, when they are denied access to that scheme as a result of their age.

2. Whether Appellants' claims are moot.

3. Whether Appellants, as adult Americans, have the right to carry handguns in public for self-defense and other lawful purposes.

## STATEMENT OF THE CASE

In Georgia, except in limited defined circumstances that do not permit carrying firearms in public, "no person shall carry a weapon unless he or she is a lawful weapons carrier." O.C.G.A. § 16-11-126(g)(1). A "lawful weapons carrier" is defined as

> any person who is licensed or eligible for a license pursuant to Code Section 16-11-129 and who is not otherwise prohibited by law from

4

possessing a weapon or long gun, any resident of any other state who would otherwise be eligible to obtain a license pursuant to such Code section but for the residency requirement, and any person licensed to carry a weapon in any other state.

O.C.G.A. § 16-11-125.1(2.1).[1] Plaintiffs do not possess licenses and do not qualify as persons who are "eligible for a license" under Georgia law, because Georgia exempts "[a]ny person younger than 21 years of age" from eligibility unless that person is a member or honorably discharged former member of the United States military. O.C.G.A. § 16-11-129(b)(2)(A).

Thus, in Georgia, ordinary, law-abiding 18-to-20-year-old adults generally are categorically barred from carrying a loaded handgun in public. Initial violations of these restrictions can be punished by a $1,000 fine and twelve months imprisonment and each subsequent violation within a five-year span is a felony punishable by imprisonment of not less than two and up to five years. O.C.G.A. §§ 16-11-126(h); 17-10-3.

---

[1] This is how these statutes read today. When Plaintiffs filed their Complaint, the statute required Georgia residents to possess a license to carry a handgun in public. Now they may carry *either* with a license or if they are eligible for a license. As discussed below, this was the basis for the District Court's finding of mootness, but in reality, the law, as applied to Plaintiffs, is the same today as it was when they filed suit. They are ineligible for carry licenses and as a result cannot lawfully carry a handgun in public. To the extent the law would let them carry if they obtained a carry license from another state, *but see* O.C.G.A. § 16-11-126(d)(1)(A) (providing that individuals with licenses from other states "shall carry the weapon in compliance with the laws of this state"), Georgia cannot rely on *other* states respecting the Second Amendment to excuse its own violation, *see Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011).

These provisions (collectively, "the Carry Ban") are made effective by the Defendants in this action. Defendant Christopher Wright, the Commissioner of the Department of Public Safety is charged with "furnish[ing] application forms and license forms" for individuals seeking weapons carry licenses. O.C.G.A. § 16-11-129(a)(2)(C)(iii). The forms must "be designed to elicit information from the applicant pertinent to his or her eligibility under this Code section," *id.* including, *only* for individuals under 21, asking whether they are active or honorably discharged members of the military. Completed forms are reviewed by probate judges, including Defendants Genola Jackson, Janice D. Spires, and Kathryn B. Martin (the probate judges for each county in which an Individual Plaintiff resides, hereinafter collectively "the Probate Judges"), who must issue licenses to any applicant who has submitted to a mandatory background check and is not ineligible on account of their age, criminal record, or mental health history. *Id.* § 16-11-129(a)(1), (b) & d(1)(A). The Probate Judges do not have discretion in the matter—the statute *requires* them to issue a weapons carry license to any qualified applicant within 10 days of receiving the results of the background investigation "unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section." *Id.* § 16-11-129(d)(4).

Individual Plaintiffs (Baughcum, Meyers, and Long) are all responsible, law-abiding adult 18-to-20-year-old citizens, residents of Georgia, who have never been members of the armed forces and are not disqualified by anything but their age from exercising their Second Amendment rights under Georgia law. App. 17–22, 41, 43, 45. Baughcum is a student who works a part time job in a machine shop. App. 17 41. He owns a Smith and Wesson Shield EZ handgun that he is not allowed to carry for purposes of self-defense, even though he has become increasingly concerned with a rise in violent crime in his area and his job frequently requires him to travel alone in higher crime areas to drop off products and pick up raw materials. App. 17–18, 41. Meyers is a full-time electrician who also often travels alone for work to public areas and does so in a work truck that contains a lot of valuable tools and equipment. App. 19, 43. Like Baughcum, Meyers owns a handgun that he would carry in public for self-defense purposes but cannot because he cannot acquire a weapons license. App. 19–20, 43. Long is a full-time student, dual enrolled in high school and a local community college. App. 21, 45. She and her friends have been harassed when going around town to run errands in areas with local reputations for street crime. App. 21, 45. Long would acquire a handgun and carry it on her person, but like the other Individual Plaintiffs, she is ineligible for a carry license due to her age. App. 21–22, 45.

Firearms Policy Coalition ("FPC") is a nonprofit organization dedicated to

7

promoting the right to keep and bear arms. App. 13–14, 47. FPC has members between 18 and 21 years old, including Individual Plaintiffs, and it brings this action on behalf of its 18-to-20-year-old members in Georgia who have been adversely and directly harmed by Defendants' enforcement of the Carry Ban. App. 13–14, 17, 19, 21, 41, 43, 45, 47–48.

Plaintiffs initiated this action on May 20, 2021. *See* App. 8–33. All Defendants moved to dismiss the action on August 10, 2021. *See* App. 34, 37. Plaintiffs opposed dismissal and moved for summary judgment on all claims. *See* App. 40. Following briefing, the District Court issued two orders which are appealed here. On April 5, 2022, the District Court found Plaintiffs lacked standing to sue the Commissioner because their injuries were not traceable to his duty to provide the forms on which applications must be made. App. 64. On October 6, 2022, the District Court dismissed Plaintiffs' suit in its entirety, likewise finding Plaintiffs lacked standing against the Probate Judges because no Plaintiff had applied for a license and so no Probate Judge had ever denied them a license. App. 70. The District Court also found that the passage of the Georgia Constitutional Carry Act mooted Plaintiffs' claims. App. 71. Each of these decisions was erroneous, and Plaintiffs filed their notice of appeal to this Court on October 11, 2022. App. 75.

## STANDARD OF REVIEW

"In reviewing the district court's decision to grant a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), [this Court] reviews the legal conclusions of the district court *de novo*." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). The same standard governs review of the District Court's decision that Plaintiffs' claims are moot. *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1250 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Plaintiffs' claims on standing and mootness grounds. In light of the importance of the constitutional issues presented by this case, rather than remanding to the district court, this Court should address the constitutionality of the Georgia Carry Ban in the first instance.

I.    The District Court erred in finding Plaintiffs lacked standing to sue the Commissioner and the Probate Judges. Plaintiffs are 18-to-20-year-olds who desire to carry handguns in public for self-defense. Georgia makes it unlawful for them to do so unless they are eligible for handgun carry licenses, but they are not eligible for those licenses due to their age. They have standing because their inability to exercise their Second Amendment rights is an ongoing injury that is directly traceable to the Commissioner—who provides the forms by which they must apply and which make clear that their applications should be denied based on their age and lack of military

9

experience—and the Probate Judges—who are the officials charged with reviewing applications and who would certainly deny Plaintiffs' applications.

II.      The District Court also erred in finding Plaintiffs' claims are moot. Although Georgia recently revised the laws at issue in the case, their central features remain unchanged. Ordinary adults 18-to-20-years-old generally remain unable to lawfully carry firearms in public because they are ineligible for carry licenses in Georgia. An order requiring Plaintiffs to be granted licenses if they can show that they are eligible but for their age would redress their injuries, so their claims are not moot.

III.      This Court should not just reverse the District Court's decision dismissing the case, it should consider the merits of Plaintiffs' claims and direct judgment be entered in their favor. Virtually every reason this Court has given for addressing a question not reached by the District Court is present here. Plaintiffs' claims involve the exercise of a fundamental right and the specific question raised by the case is of significant public importance. If the case is remanded, it is likely that Individual Plaintiffs will age out of the Carry Ban's coverage before this case can be finally adjudicated. Judicial economy would be furthered by addressing this case now, as the Supreme Court in *Bruen* demonstrated is proper.

IV.      Under *Bruen*, this Court must analyze the text and history of the Second Amendment to determine whether the Carry Ban is constitutional. The text

10

demonstrates that Plaintiffs fall within its protection. The Amendment enshrines a right of "the people," which *Heller* has already held presumptively means all Americans. Because the text facially applies to Plaintiffs, it is Defendants' burden to defend Georgia's law by demonstrating a tradition of distinctly similar regulations that have been historically accepted as constitutional. Defendants will not be able to carry that burden because at the time the Second Amendment was ratified, 18-to-20-year-olds were understood to have full rights regarding firearms.

## ARGUMENT

### I.  Plaintiffs Have Standing to Sue All Defendants and Their Claims Are Live.

To have standing, a litigant must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). Plaintiffs are suffering an ongoing injury in fact in the form of the denial of the Second Amendment right to carry firearms in public for self-defense. That injury is directly traceable—meaning that a "causal connection" "link[s] the injury to the complained-of-conduct," *Strickland v. Alexander*, 772 F.3d 876, 885 (11th Cir. 2014)—to each of the Defendants. The Probate Judges are the officials in the counties where each of the Individual Plaintiffs reside who are statutorily charged with granting or denying carry licenses. O.C.G.A. § 16-11-129(a)(1). It is beyond question that, if Plaintiffs were to apply, they would *certainly* be denied a license

11

because they are under 21 years old. O.C.G.A. § 16-11-129(b)(2)(A). Their injury is furthermore traceable to the Commissioner, who is responsible for "furnish[ing] application forms and license forms" for handgun carry licenses. O.C.G.A. § 16-11-129(a)(2)(B)(iii). The forms the Commissioner "furnish[es]" require anyone under 21 to indicate and provide proof of service in the military, so Plaintiffs' inability to acquire a license, or even to apply for one, is fairly traceable to the Commissioner. As a result, Plaintiffs' injuries would be redressed by court orders against all Defendants. If the Commissioner were enjoined to change the forms to note that 18-to-20-year-olds are eligible for carry licenses like all other adults, and if the Probate Judges were enjoined to consider Plaintiffs' applications notwithstanding their age, their injury would be *fully* redressed. Nevertheless, the District Court held Plaintiffs lack standing to sue *all* Defendants.

## A. The District Court Erred in Dismissing Plaintiffs' Claims Against the Commissioner.

Regarding the Commissioner, the District Court held Plaintiffs' injuries were not traceable to him because his statutory charge to provide forms for license applications "does not grant him any authority or control over the decision to issue a license" and the decisions made by probate judges' decisions on license applications are not "dependent upon or caused by the wording of the application form." App. 64.

Traceability does not require that the Commissioner have "control" over the ultimate decision regarding Plaintiffs' right to acquire carry permits—it merely requires a "causal connection" that "link[s] the injury to the complained-of conduct." *Strickland*, 772 F.3d at 885. "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (cleaned up); *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("Importantly, in evaluating Article III's causation (or 'traceability') requirement, we are concerned with something less than the concept of 'proximate cause.' "). That standard is met here by the fact that the Commissioner is responsible for creating the forms which Plaintiffs must use to apply for a carry license and providing them to the Probate Judges. O.C.G.A. § 16-11-129(a)(2)(C)(iii). And the forms are not neutral. In addition to requiring date of birth—which will indicate whether the Plaintiffs are at least 21 years old—the application requires an applicant whose age is "<21" to check a box and "attach proof of completed basic training or honorable discharge." App. 52. The reason for this line is clear: under Georgia law, 18-to-20-year-olds are eligible for a license only if they are serving in or honorably discharged from the military. O.C.G.A. § 16-11-129(b)(2). The effect of this line is equally clear: individuals under 21 years old, like Plaintiffs, who have not served in the military simply cannot fully complete the form for a carry license. Their injury

13

is therefore traceable to the Commissioner. He creates an obstacle to application by creating the form and Plaintiffs, as a result, are not able to exercise their Second Amendment right to carry a firearm lawfully in Georgia. And this injury is redressable—the Court could order the Commissioner to change the forms to no longer require additional documents from 18-to-20-year-old applicants.

In keeping with this Court's liberal construction of the traceability requirement, other circuits have found standing to sue for similar relief. In *Texas Democratic Party v. Abbott*, Plaintiffs who were under 65 years old brought an age-based discrimination challenge against the inclusion of a check box on an absentee ballot form that allowed an individual to indicate eligibility to vote absentee because they were at least 65 years old. The Fifth Circuit held that Plaintiffs had standing to sue the Texas Secretary of State based on his duty to "design the application form for mail-in ballots and to provide that form to local authorities and others who request it." 978 F.3d 168, 179 (5th Cir. 2020) (internal citation omitted). In finding the Secretary of State's actions "traceable" to the alleged harm of not being able to vote absentee, the Fifth Circuit explained that "[t]he Secretary would need to correct the form should the judiciary invalidate the age-based option. Thus, the Secretary of State had a role in causing the claimed injury and is in a position to redress it at least in part. That is enough to confer standing." *Id.* at 178. The Eighth Circuit reached a similar conclusion in *Henne v. Wright*, 904 F.2d 1208 (8th Cir. 1990). In that case,

14

two mothers sued the head of the Nebraska Department of Health because they had not been permitted by hospital staff to give their children their preferred surnames at birth (and had been required to either use their own or their husbands' surnames). *Id.* at 1210. Everyone agreed hospital personnel were the ones who ultimately caused babies to be assigned surnames against their parents' wishes by filling out prescribed state forms, but because the Nebraska officials "furnish[ed] the forms and instructions by which hospital personnel in Nebraska effect[ed] the surname restrictions, plaintiffs' action directly challenge[d] the conduct of defendants" and so they had standing to sue the makers of the forms. *Id.* at 1211. This case is the same. Georgia law requires the Probate Judges to assess eligibility for a carry license based on a completed application in the form prescribed by the Commissioner. Plaintiffs have directly challenged the conduct of the Commissioner in designing that form and have standing.

This Court's decision in *Jacobson* is not to the contrary. In *Jacobson*, the Court held that traceability was lacking where a group of voters had sued the Florida Secretary of State over the order in which candidates' names appeared on ballots. Although the Secretary was responsible for certifying the names that were to appear on the ballot, Florida law assigned the responsibility for "printing the names of candidates on the ballots in the order prescribed by the ballot statute" exclusively to *county* officials, and there was no "evidence to establish that the Secretary plays any

role in determining the order in which candidates appear on ballots." 974 F.3d at 1253. Here, there can be no dispute that the Commissioner is the sole official responsible for creating the forms by which Plaintiffs must apply for carry licenses. Plaintiffs' injuries are therefore traceable to the Commissioner's actions, and it was error for the District Court to dismiss claims against him. To be clear, Plaintiffs would have standing and could obtain redress from this lawsuit *without* the Commissioner as a defendant, but the Commissioner still is a proper defendant given his role in the permitting process.

Finally, although, as discussed below, recent changes to Georgia's Carry Ban do not moot Plaintiffs' claims, they *do* provide an additional basis for standing against the Commissioner. Under current law, individuals in Georgia are eligible to carry with a license or if they are *eligible* for a license. The Commissioner, in addition to creating license application forms, is the head of the Georgia State Patrol, which has the authority to enforce Georgia criminal law. O.C.G.A. § 35-2-32. An injunction against the statutory provision making 18-to-20-year-olds ineligible for a license therefore would benefit Plaintiffs by preventing the Georgia State Patrol from arresting Plaintiffs were they to carry without a license.

## B. The District Court Erred in Holding Plaintiffs Lack Standing to Sue the Probate Judges.

The District Court also dismissed Plaintiffs' claims against the Probate Judges, deciding that Plaintiffs had failed to allege an "injury in fact" (or that they

had not alleged an injury "fairly traceable" to the Probate Judges) because they had never applied for and been denied a Georgia carry license by them. App. 71. The District Court considered applying to be a "necessary step in order to legally challenge the conduct of the Probate Judge Defendants." App. 70.

This was also error. Plaintiffs have undeniably suffered an injury in fact. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). This test is easily met here— it is unlawful for Plaintiffs to carry handguns and Plaintiffs would certainly be denied a license if they applied for one, though they stand ready to apply if the law did not foreclose success. *See Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 206 (3d Cir. 2021). The District Court's insistence that Plaintiffs should have applied anyway is directly contrary to precedent. "Courts have long recognized circumstances in which a failure to apply may be overcome by facts which demonstrate the futility of such application." *Terry v. Cook*, 866 F.2d 373, 378 (11th Cir. 1989). As the Supreme Court has put it, "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected

themselves to personal rebuffs." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 365 (1977). Here, Georgia has announced a policy of "21+ only" which is apparent from the law and from the face of the application. It cannot be that Plaintiffs lack standing because they got the message and sued to change the law without subjecting themselves to certain denial. *See Carney v. Adams*, 141 S. Ct. 493, 503 (2020); *see also Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 & n.2 (1982) (failure to submit an application for a permit that "would not have been granted" under governing law did not defeat standing); *Ellison*, 11 F.4th at 205–06; *Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020) ("Entering a bid makes the injury actual; deciding not to bid makes the injury imminent.").

In fact, as discussed above, the application form requires that any 18-to-20-year-old seeking a license submit proof of military service, which Plaintiffs do not have. It is actually *impossible* for them to submit a complete application under the current regime. And if Plaintiffs cannot be required to do something futile to perfect their standing, they certainly cannot be expected to do the impossible.

The District Court's conclusion that Plaintiffs' injuries are not "fairly traceable" to the Probate Judges was based on this same faulty reasoning. It is wrong to say the Probate Judges have not "harmed" Plaintiffs "because they have never engaged with Plaintiffs in any manner whatsoever." App. 71. In a pre-enforcement

challenge like this one, traceability is present where the injury is directly traceable to the operation of the unconstitutional law and Plaintiffs would be redressed by an injunction against the defendants. *See Ga. Latino All. for Human Rights v. Gov. of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012). Of course the Probate Judges have never denied an application from the Plaintiffs; Plaintiffs have never made one. But the Probate Judges are required by law to deny applications of any 18-to-20-year-old who applies without proof of military service, and so Plaintiffs require an injunction against them to vindicate their rights under the Second and Fourteenth Amendments.

To the extent the District Court's decision was also based on a concern about the ripeness of Plaintiffs' claims, *see* App. 89 ("Plaintiff[s] have asked this Court to become entangled in an abstract disagreement between Plaintiffs and the Probate Judge Defendants."), that decision was wrong as well. For the same reasons that Plaintiffs have standing—they have suffered an injury traceable to the Probate Judges—their claims are ripe. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) ("The Supreme Court has long since held that where the enforcement of a statute is certain, a preenforcement challenge will not be rejected on ripeness grounds.").

### C. Plaintiffs' Claims Are Not Moot.

In addition to finding that Plaintiffs lacked standing against all Defendants, the District Court also held Plaintiffs' claims are moot. The District Court reached

this conclusion without the benefit of briefing on the issue, and its conclusion was in error. A case becomes moot "if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (cleaned up). This case is not moot, because Plaintiffs' injuries would still be redressed by an order requiring the Commissioner to change the forms by which an application for a carry license must be made, and an order instructing the Probate Judges to grant Plaintiffs licenses to carry, notwithstanding their age, if they meet all the non-age-related eligibility requirements.

The District Court's conclusion was based on a misunderstanding of the effect of the Georgia Constitutional Carry Act on Plaintiffs' claims. As explained above, when Plaintiffs filed their suit, Georgia required a license to carry a handgun in public. *See* O.C.G.A. § 16-11-126(h)(1) (2017) ("No person shall carry a weapon without a valid weapons carry license" unless certain exceptions apply.). As a result, an injunction requiring them to be granted licenses (provided they proved they were otherwise eligible) would have redressed their injuries. In April of this year, Georgia amended the challenged statutes through the Georgia Constitutional Carry Act. Under the Act, Georgia no longer requires a license for some people to carry a handgun in public (though, importantly, it still offers licenses). Instead, Georgia now prohibits carriage by anyone who is not a "lawful weapons carrier," O.C.G.A. § 16-

11-126(g)(1), and that category includes "any person who is licensed or eligible for a license pursuant to Code Section 16-11-129." O.C.G.A. § 16-11-125.1(2.1). The District Court, reading this language, concluded that "the Court cannot afford the relief that Plaintiffs requested from the Probate Judge Defendants because they are prohibited from carrying a firearm in public regardless of whether the Probate Judge Defendants issue a license to them." App. 91. But this is simply wrong. "Lawful weapons carrier" still includes any person licensed under Georgia law, even if they are not "eligible for a license" under the text of the statute, so if the Probate Judges were enjoined to grant Plaintiffs licenses, they could lawfully carry in Georgia. Similarly, the Commissioner could be enjoined from enforcing the law against Plaintiffs for carrying unlicensed like other Georgian adults may do. Plaintiffs' claims are therefore not moot. Indeed, they could still get the exact relief they were seeking when they filed this lawsuit—an injunction resulting in them being eligible for a license to carry a firearm notwithstanding their age.

## II.    This Court Can and Should Review the Merits of Plaintiffs' Claims.

Although ordinarily appellate courts do not review issues not passed on by the District Court, "[t]his principle is a rule of practice . . . not a jurisdictional limitation." *Ochran v. United States*, 117 F.3d 495, 502 (11th Cir. 1997). This Court has recognized several circumstances in which it is appropriate to consider an issue even though the District Court did not rule on it, including where the issue "involves

a pure question of law, and if refusal to consider it would result in a miscarriage of justice," "where the interest of substantial justice is at stake," "where the proper resolution is beyond any doubt," or where the "issue presents significant questions of general impact or of great public concern." *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360–61 (11th Cir. 1984) (quotations and citations omitted); *see also Henderson v. Scientific-Atlanta, Inc.*, 971 F.2d 1567, 1570 (11th Cir. 1992) ("We decline to remand this case to the District Court . . . because the issue is solely a question of law and does not require any additional fact-finding."). This case satisfies each of these requirements and presents a notably stronger case for resolution than some in which this court has nevertheless reviewed issues in the first instance. The constitutionality of the Carry Ban was fully briefed to the district court and none of the arguments presented here could be said to have been waived. *See, e.g., Dean Witter Reynolds*, 741 F.2d at 360 ("[A]n appellate court generally will not consider a legal issue or theory unless it was *presented* to the trial court." (emphasis added)).

First, this case poses a pure question of law. Do 18-to-20-year-olds have Second Amendment rights like other adult Americans? If so, then there is no basis for denying Plaintiffs access to Georgia's handgun carriage scheme; if not, then Plaintiffs have failed to state a claim. Either way, no factual development is needed, just legal analysis that this Court is well-positioned to undertake. The Supreme

Court's *Bruen* and *Heller* decisions both demonstrate that it is proper for this Court to assess the merits even though the District Court did not. In *Bruen*, Plaintiffs filed a lawsuit that was foreclosed by circuit precedent and the District Court entered judgment on the pleadings without any factual development. *New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018). In holding New York's may-issue licensing scheme invalid under the Second Amendment, the Supreme Court expressly rejected the argument that it should remand to "giv[e] respondents the opportunity to develop an evidentiary record," because "in light of the text of the Second Amendment, along with the Nation's history of firearm regulation," the conclusion "that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense" did not turn on disputed factual questions. *Bruen*, 142 S. Ct. at 2135 & n.8. The case turned on disputes over "legislative facts," not the sort of facts found in discovery or "determined in trials." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).[2] As such, the Supreme Court was as well placed as a trial court to weigh

---

[2] *Moore* itself provides another example of a Court resolving purely legal Second Amendment issues directly for the first time on appeal rather than remanding to the District Court. There the Seventh Circuit noted that "[t]he usual consequence of reversing the dismissal of a suit . . . is to remand the case" but there were "no evidentiary issues" requiring development in the District Court and "[t]he Supreme Court's interpretation of the Second Amendment therefore compel[led] [the court] to reverse the decisions in the two cases before [it] and remand them to their respective District Courts for the entry of declarations of unconstitutionality and permanent injunctions." 702 F.3d 942.

the "facts" and decide the issue. *Heller* is even more similar to the present case—it came to the Supreme Court on grant of a motion to dismiss and denial of summary judgment as moot, *see Parker v. District of Columbia*, 311 F. Supp. 2d 103, 109 (D.D.C. 2004)—and yet the Supreme Court was able to resolve the case by first conducting a "textual analysis focused on the normal and ordinary meaning of the Second Amendment's language," and then assessing "whether [the Court's] initial conclusion was confirmed by the historical background of the Second Amendment," *Bruen*, 142 S. Ct. at 2127 (citations and quotations omitted).

Second, this Court should resolve this case directly because "the interest of substantial justice is at stake" and the "issue presents significant questions of general impact or of great public concern." *Dean Witter Reynolds*, 741 F.2d at 360–61. "The interests of substantial justice are generally equated with the vindication of fundamental constitutional rights." *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1301 (11th Cir. 2003) (cleaned up). The Second Amendment right to carry firearms for self-defense is just such a right. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). The Individual Plaintiffs are 18-to-20-year-olds and they are denied exercise of this fundamental right solely because of their age. It is an unfortunate reality that long litigation timelines can make it so that they may not be able to see their rights vindicated in time for it to matter. *See, e.g.*, *Hirschfeld v. BATFE*, 14 F.4th 322 (4th Cir. 2021) (vacating as moot decision holding 18-to-20-year-olds had Second

24

Amendment right to purchase handguns because all Plaintiffs were at least 21 years old). That result is likely if this Court reverses the District Court's decisions regarding standing and mootness but declines to go further and instead remands for summary judgment proceedings before the District Court. This case was filed 18 months ago. In another 18 months, each Individual Plaintiff will have had their claims mooted by the passage of time and will have functionally lost the case, even if relief is eventually granted to the Firearms Policy Coalition and its members who are between the ages of 18 and 21 at that time.

Third, this Court should decide the merits of Plaintiffs' claims because "the proper resolution is beyond any doubt." *Dean Witter Reynolds*, 741 F.2d at 361. As discussed in detail below, the Supreme Court has prescribed a test for evaluating Second Amendment claims that greatly reduces their complexity and it has also held that the Second Amendment protects the right to carry handguns in public for self-defense. The question raised by this case is therefore narrow: Does the Second Amendment protect 18-to-20-year-old adults? The text of the Second Amendment and the history of lawful regulation of firearms carriage in our country confirm beyond any doubt that the answer must be "yes."

Finally, the ordinary reasons to remand to the District Court—"concern for avoiding prejudice to the parties" and "concern for judicial economy," *Ochran*, 117 F.3d at 503—are both irrelevant here. There can be no prejudice because the issues

were fully briefed to the District Court, *see* App. 57–58, and can be fully briefed here as well—and "no great gains in judicial economy are achieved by refusing to consider purely legal arguments" like those presented here. *Ochran*, 117 F.3d at 503. Given the posture of the case and the purely legal issues implicated by Plaintiffs' claims, remand could "itself work a significant loss of judicial resources." *Id.* This Court should reach the ultimate issue in this case and direct judgment be entered in Plaintiffs' favor.

## III.  Plaintiffs Are Entitled to Judgment in Their Favor.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This constitutional provision "protect[s] an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. That right presumptively "belongs to all Americans," not "an unspecified subset," *Heller*, 554 U.S. at 580, 581, 592, and applies equally against the states through the Fourteenth Amendment, *McDonald*, 561 U.S. at 778. The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense . . . [and] demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). For that reason, no important government interest can justify legislation that conflicts with the protections of the Second

Amendment. The test that this Court must apply to assess whether the Carry Ban is constitutional is straightforward:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2129–30. Here, the text of the Amendment encompasses 18-to-20-year-olds, and Defendants will not be able to demonstrate a historical tradition of firearm regulation at all comparable to the Carry Ban, so this Court should direct summary judgment be entered in Plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

### A. The Second Amendment's Plain Text Covers Plaintiffs' Rights to Carry Firearms in Public for Self-Defense.

*Bruen* established once and for all that the Second Amendment right "to keep *and bear* arms" means just what it says—the right to carry (or bear) firearms in public is protected just as much as the right to own (or keep) them. Plaintiffs' challenge is, therefore, within the scope of the Second Amendment, and the burden is on Defendants to justify the Carry Ban. The only possible feature that could differentiate this case from *Bruen* is Plaintiffs' age, but the Court should reject any argument to that effect. Under *Bruen*, this first question is a textual one, and here

two key elements of the Amendment's text remove any doubt that 18-to-20-year-olds fall within its scope.

*First*, the Amendment refers to a right of "the people" to keep and bear arms without mentioning age. The "normal and ordinary meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *accord* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833) ("The right of the *citizens* to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. Georgia*, 1 Ga. 243, 251 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147). To the extent any age-based restrictions may be squared with the Second Amendment, those must be proven by the government under *Bruen*'s historical analysis.

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, the

Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives); *id.* amend. XXVI (voting age at 18). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021). And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally, the First and the Fourth Amendments, the rights extend fully to 18-year-olds and in fact extend to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against [unreasonable searches and seizures] by public school officials."); *see also Hirschfeld*, 5 F.4th at 421. "When the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880). Even where "the people" does not appear, *every other constitutional right* applies *at least*

to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the rights such as jury trial, voting, and marriage apply at least to those 18 years old).

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well regulated Militia, being necessary to the security of a free State . . . ." As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right is not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women like Plaintiff Long), "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual would have been a member of the "militia," *at least* his rights must be protected by the Amendment.

At the Founding, the "militia" was widely understood to refer to the collection of "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19 & App'x 2 (9th Cir. 2022) (collecting post-ratification state militia laws), *vacated and remanded in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022) (Mem.). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act, subd. ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified, "commanded that

every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right vests by age 18.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834).

31

Although previously "military age ha[d] generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id.* at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed from the colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60

32

(depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 & n.46 (1983). Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* at 596 (quoting Act of May 8, 1792) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the passage of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Id.*; *see also Hirschfeld*, 5 F.4th 407, 429–30 ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right."). As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

Finally, it is worth noting that this understanding of the scope of the right, and the importance of the "militia" in the prefatory clause persisted well beyond the time of the Founding. It was still the view in the 19th century following the ratification of the Fourteenth Amendment. As Thomas Cooley wrote in his 1880 treatise, when interpreting the Second Amendment's text,

> [i]t might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms and they need no permission or regulation of law for the purpose.

34

COOLEY, *supra*, GENERAL PRINCIPLES at 271. The Court in *Heller* noted: "All other post-Civil War 19th-century sources we have found concurred with Cooley." 554 U.S. at 618. The text of the Amendment cannot be read in any way to exclude 18-to-20-year-olds from its coverage.

## B. The Carry Ban Cannot Be Justified by Reference to Historical Analogues.

The Second Amendment's text covers an 18-to-20-year-old individual's right to carry firearms in public for self-defense. Georgia's Carry Ban nevertheless denies Plaintiffs the ability to exercise that right. Under *Bruen*, the Carry Ban is presumptively unconstitutional unless the Defendants can "justify [the] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The Supreme Court was clear: the burden is on the government to *prove* that the Carry Ban is constitutional, and the only acceptable standard against which to judge its constitutionality is the history of traditional firearm regulation in this country. *Id.*; *see also id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

Defendants will not be able to carry this burden, but before we begin analyzing the historical record, it is important to keep in mind that the most important historical

35

period for interpreting the Second Amendment is the time immediately before and after its ratification in 1791. *See* Mark W. Smith, *"Not all History is Created Equal": In the post-*Bruen *World, the Critical Period for Historical Analogues is When the Second Amendment was Ratified in 1791, and Not 1868*, SSRN (Oct. 1, 2022), *available at* https://bit.ly/3Dm2HEI.

Two principles require this Court's analysis to focus on 1791 and the surrounding period. First, the Second Amendment has the same meaning applied against the federal government and the states. *See McDonald*, 561 U.S. at 765 (noting the Court's "decisive[]" holding "that incorporated Bill of Rights protections 'are all to be enforced . . . according to the same standards that protect those personal rights against federal encroachment' " (citation omitted)); *see also Bruen*, 142 S. Ct. at 2137 ("[I]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Second, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for determining the meaning of the Bill of Rights. " 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*' " 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35 (emphasis in *Bruen*)). Almost a century ago, the Court explained that the First Congress of 1789 is "a Congress whose constitutional decisions have always

36

been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174–75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g., Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

This Court must follow those decisions, even if *Bruen* had cast had doubt on them. *See, e.g., Agostini v. Felton*, 521 U.S. 203, 237 (1997). But *Bruen* reaffirms the primacy of 1791 in this Court's analysis. It too treated evidence surrounding 1791 and the Founding as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. *Bruen* cautioned that "post-Civil War discussions of the right to keep and bear arms [which] 'took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.' " *Id.* (quoting *Heller*, 554 U.S. at 614); *see also id.* at 2163 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." (Barrett, J., concurring)). And evidence from the 20th century was so remote that the *Bruen* court did not even bother to address it, noting that "20th-century evidence . . . does not provide insight into the meaning

of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28.

This Court must therefore focus on 1791 in its analysis of the scope of the Second Amendment right, but in this case the difference between 1791 and 1868 is ultimately not significant. As discussed in detail below, the unanimous practice from the Founding of permitting 18-to-20-year-olds to exercise their Second Amendment rights on equal footing with other adults was still the overwhelming majority practice in the states in 1868.

### 1. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights On Equal Footing With Other Adults.

Even before the Founding era, "[t]he tradition of young adults keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. As discussed above, immediately after the Amendment was ratified the age for militia participation was set by every state and the federal government at 18. And the point bears underscoring—militia membership did not just entail an entitlement to own a firearm, it *required* ownership. *United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves."). This requirement means that not only were 18-year-olds at the Founding entrusted with bearing arms during their time participating in militia

38

service, they were also expected to keep and maintain their arms as private citizens. It also means they were entitled to carry them in public, since there were no laws restricting the carry rights of 18-to-20-year-olds at the Founding. In addition to this "founding-era evidence of militia membership [which] undermines Defendants' interpretation" of the Amendment, young adults were expected to bear arms as part of *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722 (cleaned up). Similarly, at common law by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *Second Amendment Rights*, *supra* at 534.

Against this extensive evidence of Founding-era arms-bearing by 18-to-20-year-olds, there is no evidence of any laws restricting the carry rights of 18-to-20-year-olds because of their age. Rather, the court in *Jones* likewise found that in the period immediately following ratification "every state's militia law *obliged* young adults to acquire and possess firearms." 34 F.4th at 719. After exhaustively surveying historical gun regulations related to firearm purchasing by young adults, the Fourth Circuit in *Hirschfeld* concluded that "[w]hile some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856." 5 F.4th at

437. Judge Jones in *NRA II* similarly criticized the panel decision for suggesting that restrictions on purchasing by 18-to-20-year-olds were "longstanding" based on evidence of statutes that were, in many cases, not complete bans on purchasing and, like in *Hirschfeld*, dated to 1856 at the very earliest. 714 F.3d at 344 (Jones, J., dissental) ("With its merely general references to firearms regulations at the founding and its only support in regulations against 18-to-20-year-olds late in the 19th century, the panel is unable to prove that banning commercial firearms sales to late teens has any analogue in the founding era."). There is simply not a shred of evidence from the Founding era of any "historical analogue" that attempted to constrain 18-to-20-year-olds' exercise of their Second Amendment rights in any way like the Carry Ban does here.

> ### 2. The Overwhelming Practice From the Period Surrounding Ratification of the Fourteenth Amendment Likewise Supports Plaintiffs.

As explained above, the lack of supporting evidence from the Founding era dooms Georgia's Carry Ban. But even if Reconstruction era evidence could be relevant in this context, it would not lead to a different outcome. In the Reconstruction era,

> the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense.

*McDonald*, 561 U.S. at 770. And although at this time the Second Amendment had not been incorporated against the states, many states had Second Amendment analogues that similarly protected an individual right to keep and bear arms.

It is in this period that the first laws regulating access to firearms by those under 21 begin to appear. The Ninth Circuit in *Jones* collected 28 such laws passed between 1856 and 1897. 34 F.4th at 720 & App'x 3. Of these, just two laws placed special restrictions the rights of 18-to-20-year-olds before the Civil War, one from Alabama and one from Tennessee. *See* 1856 ALA. ACTS. 17, 17; 1856 TENN. PUB. ACTS 92, 92.

These exceptions merely prove the rule that has been uniformly demonstrated from the Founding—18-to-20-year-olds were considered to have full Second Amendment rights and restrictions on the exercise of those rights are evidenced *nowhere* until over 60 years after the Amendment was ratified. *See Bruen*, 142 S. Ct. at 2137. In this case, leading up to 1856 "there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines" the importance of these Reconstruction-era outliers. *Jones*, 34 F.4th at 722. This is precisely the sort of history on which the Supreme Court warned against putting "more weight than it can rightly bear" because, "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2136–37. Furthermore, "[i]t would also be strange to rely on two southern laws restricting gun rights that

were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds).

In any event, the vast majority of the laws identified by either the *Jones* or *Hirschfeld* panels are inadequate analogues for the Carry Ban that Georgia has enacted. Noting that "everything is similar in infinite ways to everything else" so that "one needs some metric enabling the analogizer to assess which similarities are important and which are not," the Supreme Court in *Bruen* instructed courts looking for historical analogues to pay careful attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33 (cleaned up). Of the 28 Reconstruction era laws collected by the *Jones* court:

> nineteen banned sales of only pistols to minors, and several had exceptions for hunting or parental consent. Of the non-pistol bans, three only applied to minors under fifteen years old, only required parental consent, or both. Eight states banned the sale of all firearms or deadly or dangerous weapons to minors. Four of these statutes were passed between 1881 and 1885.

34 F.4th at 720.[3] Indeed, of the 20 laws from *Jones* that arguably apply to 18-to-20-year-olds at all, just *one* specifically targeted the right to carry firearms for individuals 18-to-20-years-old like Georgia's Ban does. *See* 1883 Wis. Sess. Laws 290 ("It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver . . . ."). One other law from the collection, from Kansas, banned all possession of pistols by minors. *See* 1883 Kan. Sess. Laws 159. But on the other side of the ledger, a New York law specifically declined to burden 18-to-20-year-olds' exercise of the right to carry in public by decreeing that "[n]o person *under the age of eighteen years* shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind . . . ." N.Y. PENAL CODE ch. 375 § 1 (1885). Otherwise, the laws cited in *Jones* exclusively target sales to those under 21, if they say anything at all about 18-to-20-year-olds. Though laws punishing the sale of handguns to those under 21 undoubtedly would burden their Second Amendment rights, they would not burden them in the same way—and that matters under *Bruen*. Individuals under 21 who were subject to such laws would have still, in many cases, been lawfully able to acquire a handgun from a parent or legal guardian and be subject to the same laws governing the carry of firearms as older citizens.

---

[3] Notably, the Ninth Circuit did not include in its collection laws from this period that specifically restricted the rights of African Americans or Native Americans to possess firearms. *Id.*

43

At most, this historical record shows just that two states, Kansas and Wisconsin, enacted restrictions that could plausibly serve as analogues for the Carry Ban under *Bruen*, while one state, New York, specifically carved out the age-group targeted by Georgia today. Two laws, both from 1883, cannot overcome the text of the Second Amendment itself, let alone the unified historical practice from the preceding 90 years of Second Amendment history. What is more, "we do not know the basis of their perceived legality" at the time they were enacted. *Bruen*, 142 S. Ct. at 2155. At least in the case of Kansas we can say that the state was, around this time, laboring under a serious misapprehension of the proper scope of the Second Amendment. *See id.* (labeling as "clearly erroneous" a 1905 Kansas Supreme Court case upholding a complete ban on public carry in Salinas based on the rationale that the Second Amendment did not apply outside the militia or military contexts).

Furthermore, it must be noted that of the 20 laws collected in *Jones* that arguably limit the rights of 18-to-20-year-olds at all, 15 (including both the Kansas and Wisconsin laws discussed above) do so specifically because they were "minors." We therefore can say with confidence that each of these laws is *irrelevant* to the validity of Georgia's Carry Ban for the simple reason that they are predicated on a status (minority) that does not apply to 18-to-20-year-olds in Georgia today. *Bruen* requires asking *both* "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern

44

comparator is "comparably justified." *Bruen*, 142 S. Ct. at 2132–33. To the extent these laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. *See, e.g.*, 1 BLACKSTONE COMMENTARIES *441 (1803). That is no longer the case. Plaintiffs are legal adults. And we are not aware of any law from any potentially relevant time frame that singled out the firearm rights of legal *adults* for special restrictions based on their being younger than other legal adults. *See, e.g.*, JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) (explaining that upon reaching the age of majority, "every man is in full enjoyment of his civil and political rights").

     In the end then, this case is a relatively easy one. The only possible analogues for the Carry Ban are from too late a date to overcome the text of the Second Amendment and the unanimous practice at the Founding. *See Bruen*, 142 S. Ct. at 2154 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). As Judge Jones remarked in *NRA II*:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment include[s] individuals eighteen to twenty. . . . The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.

714 F.3d at 342 (Jones, J., dissental) (internal citation omitted). The *Bruen* court largely echoed this sentiment, noting that the inquiry it was prescribing "will be fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and a "lack of a distinctly similar historical regulation addressing that problem [provides] relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. Georgia has singled out 18-to-20-year-olds for differential treatment from other adults, seemingly out of a concern that they are too young to be trusted with the right to carry a firearm. Yet the Founders knew all about 18-to-20-year-olds; they required them to possess firearms in good working order and to know how to use them so that they could be ready to serve as members of the militia if the need arose. They never enacted a *single* "distinctly similar" ban on carriage by them.

## CONCLUSION

The Court should reverse the District Court's dismissal of Plaintiffs' claims and direct entry of judgment in Plaintiffs' favor.

Dated: November 21, 2022

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

47

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 11,760 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11th CIR. R. 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: November 21, 2022                /s/David H. Thompson
                                        David H. Thompson

                                        *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on November 21, 2022. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: November 21, 2022                    /s/David H. Thompson
                                            David H. Thompson

                                            *Counsel for Plaintiffs-Appellants*