[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13444

_____

CHRISTOPHER BAUGHCUM, JR.,
ZANE MEYERS,
SOPHIE LONG,
FIREARMS POLICY COALITION, INC.,

Plaintiffs-Appellants,

*versus*

GENOLA JACKSON,
in her individual capacity and in her official capacity
as Judge of the Laurens County Probate Court,
JANICE D. SPIRES,
in her individual capacity and in her official capacity
as Judge of the Houston County Probate Court,
KATHRYN B. MARTIN,
in her individual capacity and in her official capacity
as Judge of the Lamar County Probate Court,

2                    Opinion of the Court                    22-13444

WILLIAM HITCHENS,
in his official capacity
as Commissioner of the Department of Public Safety,
CHRIS WRIGHT,
in his individual capacity,

                                        Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 3:21-cv-00036-DHB-BKE

————————————————

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

The question in this appeal is whether three young Georgians and the Firearms Policy Coalition can sue Georgia's Commissioner of Public Safety and several probate judges over the constitutionality of a state gun law. The three individual plaintiffs want to carry firearms, but the state won't let them until they are twenty-one years old. With help from the FPC, they sued three county probate judges (who issue carry licenses) and Georgia's Commissioner of Public Safety (who designs the carry license application form). The district court concluded that they lacked standing to sue any of the defendants and that the case was both moot and unripe.

We believe the district court partially erred. Although no plaintiff has standing to sue the Commissioner, the plaintiffs do have standing to sue the judges. And the case is neither moot nor unripe for the gun rights group and at least one of the individual plaintiffs. In short, this case is justiciable. So we reverse in part and remand for the district court to consider the merits.

## I.

The FPC is an advocacy group that is "dedicated to promoting the right to keep and bear arms." Its membership includes three Georgians: Christopher Baughcum, Zane Meyers, and Sophie Long. When they filed suit, all three were at least eighteen and under twenty-one. But only Baughcum remains under twenty-one.

All three individual plaintiffs allege that they want to carry guns because they regularly face dangerous situations—from working in high crime areas, to traveling with valuable equipment in public areas alone, to running errands in high crime areas where a plaintiff has faced harassment. But none has applied for a carry license in Georgia.

When the plaintiffs filed suit, Georgia's weapons carry licensing regime was fairly straightforward. The state required people to obtain licenses to carry weapons, Ga. Code § 16-11-126(h)(1) (2021), and forbade those under twenty-one from obtaining licenses unless they were active duty or honorably discharged members of the military, Ga. Code § 16-11-129(b)(2), which the three individual plaintiffs here are not. Since then, Georgia's licensing requirements have changed. Now, the state no longer requires

people to obtain licenses to carry weapons, so long as they are otherwise eligible for a license. *Id.* § 16-11-126(g)(1); *id.* § 16-11-125.1(2.1). But Georgia did not lift the bar on adults under the age of twenty-one obtaining a license.

Some other important things also stayed the same across both licensing regimes. County probate judges issue the licenses, while Georgia's Commissioner of Public Safety designs and furnishes the blank application forms that the judges process. *Id.* § 16-11-129(a)(2)(B), (a)(2)(C)(iii). The Commissioner has a minimal role in enforcing the criminal aspects of the law—he primarily oversees Georgia's highway patrol. The officers under his command are prohibited by statute from detaining people solely to investigate whether they are unlawfully carrying firearms. *Id.* § 16-11-137.

The plaintiffs say that the age restrictions on carry licenses prevent them from exercising their Second Amendment rights. So they brought suit under 42 U.S.C. § 1983 for the deprivation of their constitutional rights. Specifically, they sued three probate judges in the counties where the individual plaintiffs live and the Commissioner for a declaration that the age restriction is unconstitutional and an injunction against its enforcement, along with costs, fees, and expenses. This legal theory is not novel. *See Lara v. Comm'r, Pa. State Police*, No. 21-1832, slip op. at 3–4 (3d. Cir. Jan. 18, 2024) (holding that a state ban on 18 to 20-year-olds carrying firearms outside the home is unconstitutional).

But the district court concluded that the FPC and its three members lacked standing against the judges and the Commissioner because the members did not actually apply for and get denied any licenses. The district court also concluded that the suit was moot because the licensing regime change meant nobody needed licenses to carry weapons. And the court concluded that the suit was unripe, again because the members did not apply for and get denied licenses. The district court did not reach the merits of the challenge—whether the age restrictions to carry weapons violate the Second Amendment.

This appeal followed. During this appeal, Chris Wright retired as Georgia's Commissioner of Public Safety and was replaced by William Hitchens in all the official-capacity claims against the Commissioner.

## II.

We review the dismissal of a complaint for lack of jurisdiction *de novo*, *see Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022), including for lack of standing, *see Scott v. Taylor*, 470 F.3d 1014, 1017 (11th Cir. 2006), mootness, *see Hall v. Sec'y, Alabama*, 902 F.3d 1294, 1297 (11th Cir. 2018), and lack of ripeness, *see Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1356 (11th Cir. 2013).

## III.

The judicial power of the United States extends only to actual cases and controversies. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337

(2016) (citing U.S. Const. art. III). This case-and-controversy requirement demands we can hear only *justiciable* matters, to prevent us from "encroaching on the powers of the other branches of government" or deciding matters outside the "adversarial context." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998). Though there are many related doctrines, a justiciability inquiry is typically "composed of 'three strands': standing, ripeness, and mootness." *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (quoting *Leahy*, 145 F.3d at 1244). "The failure of any one of these strands can deprive a federal court of jurisdiction." *Id*.

Here, all three strands of justiciability are contested. First, the Commissioner and the probate judges argue that the plaintiffs lack standing to sue them. They argue that they cannot provide relief to the plaintiffs because the Commissioner does not grant licenses and the probate judges are immune. And the probate judges argue that the plaintiffs were never injured because they never applied for weapons carry licenses. Second, because the plaintiffs never applied, the probate judges argue and the district court concluded that the case is not ripe. Third, the probate judges argue and the district court concluded that the case is moot because now Georgia does not require that people have licenses to carry weapons, so long as they are eligible for licenses. Finally, another mootness issue has arisen while the case has been pending on appeal: two of the individual plaintiffs have reached the age of twenty-one and are now eligible for a license under Georgia law. We will address each of these strands of justiciability in turn.

*A.*

We will start with standing. Courts have jurisdiction to hear a case only when the plaintiff has standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, an individual plaintiff must have suffered an injury in fact, fairly traceable to the defendant, that the court can redress with an order directed at the defendant. *Id.* at 560–61. The individual plaintiffs here, Baughcum, Meyers, and Long, argue that they have been injured by the defendants' enforcement of Georgia's allegedly unconstitutional gun permitting law because it has prevented them from carrying weapons for their own protection.

Organizations, like individuals, may have standing to sue on their own behalf, but organizations may also have associational standing to sue on behalf of their members. The FPC argues that it has associational standing to bring the claims in this lawsuit. To benefit from associational standing, the FPC must establish three elements: the FPC's members must otherwise have standing to sue, the interests the lawsuit seeks to protect must be germane to the FPC's purpose, and the claim can be resolved and the requested relief granted without the participation of individual members. *Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023).

Two of the three elements for organizational standing are undisputed, and rightfully so. The interests at stake in this lawsuit—Second Amendment rights—are germane to the FPC's purpose as an organization. And the suit—a facial Second Amendment challenge seeking an injunction against the enforcement of a state

law—does not require the FPC's individual members to participate.

The only disputed question is whether the FPC has members that would otherwise have standing, such as the individual plaintiffs, to sue on their own behalf. Thus, for both the FPC's associational standing and the standing of its three individual members, the question turns on whether the individual members suffered an injury in fact that is fairly traceable to the defendant and that can be redressed by a court's order directed at the defendant. *Lujan*, 504 U.S. at 560. We believe they have.

1.

The plaintiffs argue that they have been injured, and will continue to be injured, by the threat of enforcement of an arguably unconstitutional law. We agree.

An injury in fact must be concrete and particularized and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560. A concrete injury is one that "actually exist[s]" and is "real" rather than "abstract." *Spokeo*, 578 U.S. at 340 (citations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 339 (citation omitted). An actual or imminent injury, unlike a conjectural or hypothetical one, is one which has occurred, is certainly impending, or has substantial risk of occurring. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "A plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a

statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (cleaned up).

At the time this suit was filed, all three individual plaintiffs satisfied the injury-in-fact requirement. They each alleged that they intended to carry weapons, implicating Second Amendment interests. But they were proscribed from carrying weapons by Georgia law. The relevant statute says that "no person shall carry a weapon unless he or she is a lawful weapons carrier." Ga. Code § 16-11-126(g)(1). A "lawful weapons carrier" is "any person who is licensed or eligible for a license . . . ." *Id.* § 16-11-125.1(2.1). A person is not eligible for a license if he is under twenty-one, unless he is at least eighteen and either an active duty or honorably discharged member of the military. *Id.* § 16-11-129(b)(2)(A). The individual plaintiffs were not licensed to carry weapons. Nor were they eligible for licenses. They were each under twenty-one at the time of suit, and none had served in the military.

And, of course, there exists a credible threat of prosecution. Georgia prohibits unlicensed (or, now, ineligible) carrying of weapons. Even cursory research shows Georgia's history of enforcing this law. *See Watkins v. State*, 695 S.E.2d 394, 396–97 (Ga. Ct. App. 2010); *Jordan v. State*, 304 S.E.2d 522, 523–24 (Ga. Ct. App. 1983); *Asberry v. State*, 234 S.E.2d 847, 848 (Ga. Ct. App. 1977). We can expect that, if the plaintiffs violate the law and carry a weapon when they are not eligible for a weapons carry license, they will face legal consequences. Being forced to choose between suffering

criminal punishment or giving up a constitutional right is an injury in fact.

2.

The defendants argue that, even if the individual plaintiffs have suffered a cognizable injury, the defendants are not responsible for it and cannot fix it. That is, they say that they have so little to do with the enforcement or administration of Georgia's firearm laws that the injuries are not fairly traceable to them and are not redressable by any court order against them. With respect to the probate judges, we disagree. We conclude that the individual plaintiffs' injuries are fairly traceable to and redressable by an order directed to the probate judges. But we agree that the Commissioner is too far removed from Georgia's gun laws to be subject to this suit.

An injury is fairly traceable to the defendant if it results from the defendant's action and is not the result of an independent action of some third party. *Lujan*, 504 U.S. at 560. Likewise, an injury can be redressed by the court when a decision for the plaintiff would make it significantly more likely that he would obtain relief that directly remedies his injury. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019). And it must be the effect of the court's judgment on the defendant, rather than some third party, that redresses the injury, whether directly or indirectly. *Id.*

The plaintiffs' injuries are fairly traceable to the probate judges and redressable by an order directed to them. The plaintiffs challenge the inability of those under twenty-one to obtain

licenses. Probate judges are responsible for granting and denying licenses. The individual plaintiffs have sued the probate judges in their respective counties, who are responsible for issuing licenses to them. So the injury is traceable to those probate judges. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 & n.5 (11th Cir. 2012); *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988). And because the probate judges are responsible for issuing licenses, the challenged action is also redressable by a court order against them. The district court could, if the suit is ultimately meritorious, order the probate judges to issue licenses to the plaintiffs and the FPC's similarly situated members despite the age limits in state law.

For their part, the probate judges argue that a federal court cannot redress the plaintiffs' injuries with an injunction against them because 42 U.S.C. § 1983 generally forbids an injunction against "a judicial officer for an act or omission taken in such officer's judicial capacity." They reason that, to the extent issuing a carry license is a judicial function, any order the district court entered against them could not legally redress the plaintiffs' injuries because the judges would be immune.

We disagree that the probate judges are acting in a judicial capacity when issuing these carry licenses. Probate judges in Georgia are explicitly tasked with "judicial and ministerial functions as may be provided by law," including "[p]erform[ing] county governmental administration duties," "[r]egister[ing] and permit[ting] certain enterprises," and "[i]ssu[ing] marriage licenses." Ga. Code

§ 15-9-30(b). To determine whether a probate judge is exercising a judicial or nonjudicial function, we must consult the relevant state law for signs of judicial discretion. *See Perkins v. U.S. Fid. & Guar. Co.*, 433 F.2d 1303, 1304–05 (5th Cir. 1970).

Georgia's law is pellucid. The Georgia Supreme Court has expressly held that "processing a weapons carry license does not involve the exercise of judicial power." *Roberts v. Cuthpert*, 893 S.E.2d 73, 76, 82–84 (Ga. 2023). It is, instead, a ministerial function that the legislature happened to assign to these judges. *See id.* at 82 ("Not by [a probate judge's] title, but only by his acts, can the exact capacity in which he appears ever be known upon any special occasion." (quoting *Comer v. Ross*, 28 S.E. 387, 387 (Ga. 1897))); *see also id.* (citing Ga. Code § 15-9-30(b)). After all, the statute offers probate judges nothing in the way of discretion. If a person meets the statutorily defined criteria, he gets a license. If not, he doesn't. When issuing these licenses, the probate judges act more like a municipal clerk than a judicial decisionmaker.

Moving on to the Commissioner: the plaintiffs' injuries are not fairly traceable to him and not redressable by a court order against him. An injury must be traceable to the defendant and redressable by a court order against the defendant, not a third party. *Lujan*, 504 U.S. at 560; *Lewis*, 944 F.3d at 1301. But the Commissioner is not responsible for issuing licenses nor could he issue them to the plaintiffs if ordered. As we just explained above, licensing authority lies with the probate judges.

Undeterred, the plaintiffs offer two theories against the Commissioner. Neither works.

The plaintiffs first argue that their injuries are fairly traceable to and redressable by a court order against the Commissioner because of his statutory responsibility for designing the license application form, which lists the age requirements. Our precedent forecloses that theory. In *Jacobson v. Florida Secretary of State*, we examined a law requiring ballots to first list candidates belonging to the party of the last gubernatorial victor and then list the candidate from the second-place party. 974 F.3d 1236, 1241 (11th Cir. 2020). County supervisors were responsible for placing candidates in the correct order, while the Secretary of State was to certify the nominees. *Id.* at 1253. The Democrats (the second-place party) lacked standing to sue the Secretary, in part because their injury (consistently being listed second) was not traceable to her role in certifying the candidates but rather the local county supervisors' role in placing them second. *Id.* Likewise, the injuries at issue here (not being given licenses) are not traceable to the Commissioner's decisions about how to design the form, but rather the probate judges' decisions regarding licensure applications.

The plaintiffs argue otherwise, saying that unlike the Secretary in *Jacobson*, the Commissioner here *does* directly design the relevant document that the probate judges process. But they are missing the central point. Their claimed injury isn't a bad form, but rather the restriction of licenses based on age itself. They cannot say that the Commissioner's form causes, even indirectly, the probate

judges to deny licenses. There is no reason to think that the probate judges enforce the age restriction because of the form's design, rather than their legal obligation under the statute. His control over the form does not give the Commissioner the power to make the probate judges license the plaintiffs.

The Commissioner's lack of authority over the probate judges distinguishes this case from out-of-circuit precedents that suggest a plaintiff may have standing against a statewide defendant who designs forms that local decisionmakers use to injure the plaintiff. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179–80 (5th Cir. 2020); *Henne v. Wright*, 904 F.2d 1208, 1210–11 (8th Cir. 1990). In those cases, unlike this one, the statewide defendant created outcome-determinative forms. The forms in both cases constrained the local decisionmakers—they were required to use the challenged forms and their only responsibilities were to ensure that the forms were accurately completed. Here, on the other hand, the probate judges are independently charged with investigating any applicant's compliance with the criteria for a license set forth in the statute and then issuing a license when an applicant meets those criteria. Ga. Code § 16-11-129(b), (d).

Let us now move to the plaintiffs' second theory of standing against the Commissioner. They argue that the Commissioner is the head of the Georgia State Patrol, a law enforcement agency that could arrest the plaintiffs for carrying without a license, and that the Commissioner could be ordered by a court to refrain from making such arrests. In support of that argument, they cite *Lara*, in

which the Third Circuit recently held that similar plaintiffs, including the FPC, had standing to sue the Commissioner of the Pennsylvania State Police over a similar state law. *See* No. 21-1832, slip op. at *32–35.*

We disagree. Remember, the injury must be "likely, not merely speculative, that the injury will be redressed by a favorable decision" against the defendant. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003). Two aspects of Georgia law make it unlikely that the Commissioner would be responsible for enforcing this law and thus highly speculative that any judgment against the Commissioner would redress the plaintiffs' injuries. First, unlike the Commissioner in *Lara*, the Commissioner here is not tasked with general law enforcement, but highway patrol in particular.[1] Second, Georgia law prohibits officers from detaining people solely to investigate whether they are lawful weapons carriers. Ga. Code § 16-11-137.

So, for the plaintiffs' injury to be traceable to and redressable by the Commissioner, a series of speculative events would need to

---

[1] *Compare Duties of a Trooper*, PA Trooper, https://www.patrooper.com/duties-of-a-trooper.html [https://perma.cc/DGF8-ELGW] (explaining that "The Pennsylvania State Police is a full service agency. . . . PA State Troopers provide primary police coverage . . . for over 60% of the Commonwealth's municipalities"), *with About the Georgia State Patrol*, Georgia Department of Public Safety, https://dps.georgia.gov/divisions/georgia-state-patrol/about-georgia-state-patrol [https://perma.cc/T587-TNT6] (noting that the Patrol "focuse[s] primarily on the enforcement of traffic laws and investigation of traffic crashes," though it additionally supports other law enforcement agencies in their efforts).

occur. First, the plaintiffs would need to be carrying weapons on the highway, in a manner noticeable by the highway patrol. They make no allegations in their complaint that suggest they intend to carry weapons on a highway or that their carrying would be noticeable to a highway patrolman. Second, the plaintiffs would need to be doing *something else* unlawful to allow the highway patrol to detain them for their carrying violation. Because Georgia law forbids it, we cannot presume the highway patrol would detain the plaintiffs solely to enforce the firearms laws. *See Bush*, 329 F.3d at 1266 (holding that a future injury based on the occurrence of a "random or unauthorized act[]" is "too speculative" for standing purposes). And, again, the plaintiffs make no allegations about an intent to do anything unlawful that would warrant an unrelated stop by the highway patrol that could then lead to an investigation into their carry status. The result is that the chain of events that runs from the Commissioner to the enforcement of the challenged law is far too speculative.

The bottom line is that the FPC and its members have standing to sue the probate judges but not the Commissioner.

### 3.

Finally, the probate judges argue that neither the FPC nor its three individual members have standing to sue because no member has applied for and been denied a license. Under well-established caselaw, this fact does not matter. A plaintiff can satisfy the injury-in-fact requirement even if his injury rests on a formal application he did not submit when that formal application would

merely be a "futile gesture" and he was otherwise "able and ready" to apply. *Carney v. Adams*, 592 U.S. 53, 66 (2020) (first citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977); and then citing *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982)).

Though the plaintiffs did not apply for licenses, any application for a carry license would be a futile gesture because they do not meet the state's requirements for license holders. As the Supreme Court has explained, when a statute requires that the plaintiffs be denied "a permit had they applied for one[,] [t]heir failure to apply therefore does not deprive them of standing to challenge the legality of the" statute. *Sporhase*, 458 U.S. at 944 n.2.

For their part, the plaintiffs pleaded sufficient facts to establish that—but for their age—they are otherwise able and ready to apply. Two of the three individual plaintiffs own firearms already, with the other pleading that she would acquire one if given a license to carry. None has a history of violent behavior. All allege that they regularly face dangerous situations for which they would like to carry weapons. And all allege that the active enforcement of the carry ban deters them from carrying weapons or even applying for a license.

Relying on inapposite precedents, the probate judges argue that there is no futility exception to standing. That argument is, of course, incorrect. Instead, these authorities hold only that plaintiffs cannot sue over policies or practices that are not the cause of their injuries.

In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), for example, a black man was refused service while visiting as a guest of a white member of the Lodge. The Lodge had a white-only membership policy and a policy against serving non-white guests of members. *Id.* at 165–66. The Court held that the plaintiff could not sue over the lodge's membership policies because he had never sought to be a member and apparently did not assert that he ever planned to be or wanted to be a member. Instead, because he had sought to be served as a guest, the Court held that he had standing to sue over the guest policies. *Id.* at 166–68. Unlike in *Moose Lodge*, the plaintiffs here are suing over the enforcement of the policies that prevent them from having weapons carry licenses, not policies that have not and will not affect them.

Similarly, in *Allen v. Wright*, 468 U.S. 737 (1984), a nationwide class of parents of black schoolchildren complained that the IRS did not do enough to "deny tax-exempt status to racially discriminatory private schools." *Id.* at 739. The plaintiffs pointed to two injuries caused by the beneficial tax-exempt status of racially discriminatory schools. They said that they were harmed by "the mere fact of Government financial aid to discriminatory private schools" and that the existence of "racially discriminatory private schools in their communities impair their ability to have their public schools desegregated." *Id.* at 752–53. The court held that the first injury was not judicially cognizable, *id.* at 754, and that the second injury was not traceable to the government's conduct. *Id.* at 757. Here, on the other hand, the plaintiffs' injuries are judicially

cognizable, and the plaintiffs are challenging the enforcement of a statute that has caused, and will continue to cause, those injuries.

Finally, the probate judges rely on one of our precedents in support of their argument that the plaintiffs must apply for a license, even if futile, to gain standing. But that precedent, *Swann v. Sec'y, Ga.*, 668 F.3d 1285 (11th Cir. 2012), is even further afield. Although we addressed the Supreme Court's futility caselaw in *Swann*, we expressly did so only in the context of a *post*-enforcement challenge. *Id.* at 1288–89. We held that a plaintiff challenging the post-enforcement application of a statute had to meet the standing requirements based on the facts as they had occurred, not rely "on an imaginary set of facts" that could have occurred. *Id.* at 1289. We further explained that Swann could not invoke the Supreme Court's futility caselaw because those "inapposite" authorities "address pre-enforcement challenges to statutes." *Id.* Here, unlike in *Swann*, we face a quintessential pre-enforcement challenge. In such challenges, the Supreme Court has long established a futility exception, as we recognized in *Swann. See Carney*, 592 U.S. at 66 (collecting cases).

Ultimately, we hold that there is standing for the FPC and its affected members to sue the probate judges but not the Commissioner.

*B.*

With standing out of the way, let us now turn to ripeness and mootness.

We will start with ripeness. A ripeness question requires us
to consider "whether there is sufficient injury to meet Article III's
requirement of a case or controversy and, if so, whether the claim
is sufficiently mature, and the issues sufficiently defined and con-
crete, to permit effective decision-making by the court." *Elend v.
Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006) (citation omitted). In
cases involving pre-enforcement review, like this one, the standing
and ripeness analysis tend to converge. *Id.* at 1205. The plaintiffs'
claims are ripe for the same reasons they suffered an injury in fact.
*Driehaus* makes clear that the plaintiffs need not actually face pun-
ishment or prosecution to allege a justiciable injury in fact, so long
as they face a credible threat of punishment, 573 U.S. at 158–59,
which they do.

The defendants say and the district court concluded that the
plaintiffs' claims are *not* ripe because they never applied for a weap-
ons license that was denied, nor are they facing any prosecution.
But, again, the plaintiffs need not actually apply for and be denied
a license to suffer a justiciable injury in fact. As *Carney* instructs, a
failure to apply can be overcome by facts that show such an appli-
cation would be futile, so long as the plaintiffs stood able and ready
to apply. *See* 592 U.S. at 65–66. An application for a license forbid-
den by state law would be futile, so the plaintiffs need not actually
apply to allege an injury in fact. *See Sporhase*, 458 U.S. at 945 n.2.
And, as discussed earlier, the plaintiffs here are able and ready to
apply. For similar reasons to those raised in our standing discus-
sion, the injury is ripe.

Now consider mootness. Courts have no jurisdiction to hear a case when it is moot. *See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000). "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Id.* at 1217 (cleaned up).

There are two mootness questions here.

First, did the post-lawsuit changes to the licensing regime render the plaintiffs' claims moot? The probate judges argue and the district court concluded that, because some people no longer need licenses to carry weapons after those changes, this case is moot. We disagree. The new licensing regime is a bifurcated one. There are two ways one can carry a weapon. One is by being eligible for a license (as relevant here, by being over twenty-one). The other is to obtain a license. So, after the changes to the licensing regime, if someone is eligible for a license, it is a moot point whether he can obtain one. Here, though, the underage plaintiffs remain ineligible for a license because of the preexisting statutory age limits. Although the statutory changes may affect other people, they did not affect the plaintiffs or others under the age of twenty-one—the *only* way they can carry a weapon is to get a license. Thus, there is no doubt that a live controversy continues to exist, even though the licensing regime has changed.

Second, because the case has been pending for so long, another mootness question has arisen since the district court's judgment. Have the individual plaintiffs turned twenty-one while this

suit was pending, rendering their challenge moot? We are confident that the case is not moot—at least as to one of the individual plaintiffs and the FPC. Although Meyer and Long have turned twenty-one while this case has been pending, Baughcum is still twenty. So his claim (and thus the FPC's claim based on his membership in the organization) is not moot. Moreover, the FPC is a large membership organization and says it has other eighteen-to-twenty-one-year-old members in Georgia, such that it continues to have associational standing to litigate this suit. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (stating that "large organizations like the NAACP had standing because there was a high probability that at least one of the members would be" injured (citing *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008)). On remand, the district court may evaluate whether any exception to mootness applies to Meyer's and Long's claims against the probate judges, *see, e.g.*, *Lara*, No. 21-1832, slip op. at 30–31, and whether the FPC should make allegations about, or introduce evidence of, additional members.

## IV.

The district court is **REVERSED IN PART AND AFFIRMED IN PART**. The matter is **REMANDED** for proceedings consistent with this opinion.